UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

51 WEBSTER ST., INC.,                              16-CV-468-MJR
                                                   DECISION AND ORDER
               Plaintiff

  -v-

ATLANTIC RICHFIELD
COMPANY,

               Defendant.
_____

Pursuant to 28 U.S.C. §636(c), the parties consented to have a United States Magistrate Judge conduct all proceedings in this case. (Dkt. No. 25). Before the Court are cross-motions by plaintiff 51 Webster Street, Inc. and defendant Atlantic Richfield Company to strike and exclude expert testimony. (Dkt. Nos. 35, 38, 39, 40, 42). For the following reasons, the Court denies both plaintiff's and defendant's motions to strike and exclude expert testimony.

## ***PROCEDUREAL HISTORY***

This matter was commenced in New York State Supreme Court, County of Niagara, with the filing of a summons and verified complaint, on or about April 28, 2016. (Dkt. No. 1). Plaintiff initially sued Sunoco, Inc. (R&M), Sunoco, Inc. and BP p.l.c. ("BP"). *Id.* BP removed the case to the Western District of New York on June 8, 2016. (*Id.*) A stipulation was filed on July 14, 2016 stating that BP is the parent company of Atlantic Richfield Company ("Atlantic Richfiled"). (Dkt. No. 7). The parties agreed that the complaint would be amended by removing BP and inserting in its place Atlantic Richfield Company, and by removing Sunoco, Inc. (*Id.*). Plaintiff filed an amended complaint on

August 1, 2016 reflecting these changes. (Dkt. No. 8). The Court held a preliminary pretrial conference on October 4, 2016 and issued a Case Management Order, setting forth various discovery and motion deadlines, on October 6, 2016. (Dkt. Nos. 21 and 22). Discovery commenced and the Court granted a number of extensions of time, by request of the parties, to complete discovery and file dispositive motions. (Dkt. Nos. 27, 28, 30). On June 19, 2018, the parties stipulated to the dismissal, with prejudice, of defendant Sunoco, Inc. (Dkt. No. 31). Atlantic Richfield is now the only defendant remaining in the case.

On August 30, 2018, plaintiff filed a motion to strike and exclude the testimony of defense experts Dr. Gregory Douglas and Michael Teeling. (Dkt. No. 35). On September 17, 2018, defendant filed a cross-motion to strike and exclude the testimony of plaintiff expert Jason Brydges. (Dkt. Nos. 38, 39). Plaintiff and defendant filed responses to the motions (Dkt. Nos. 40, 42) and the Court heard oral argument as to both motions on October 29, 2018. At the start of oral argument, the Court noted that a jury trial had not been requested in the complaint, amended complaint, answer or affidavits filed in connection with the notice of removal.[1] Counsel indicated that they were unsure as to whether their clients sought a jury trial. The Court instructed counsel to confer with their clients and each other, and to submit a letter stating whether they requested a jury trial. On November 27, 2018, counsel for plaintiff sent a letter to the Court confirming that a

---

[1] "On any issue triable of right by jury, a party may demand a jury trial by serving the other parties with a written demand…no later than 14 days after the last pleading directing to the issue is served." Fed. R. Civ. P. 38(b). Here, the civil cover sheet, which was completed by defendant during the removal process, indicated that a jury trial had been demanded. However, "a civil cover sheet that has not been served with the complaint naturally gives no notice of a jury demand necessary to meet the requirements of Rule 38(b)." *Favors v. Coughlin*, 877 F.2d 219, 220 (2d Cir. 1989).

2

jury demand had not been filed and stating that neither party intended to seek a jury trial. Thus, the trial in this matter will proceed as a non-jury trial before this Court.

## *RELEVANT FACTS*

This case involves a contiguous piece of property located at 51 Webster Street and 68 Main Street, Tonawanda, New York (the "Site").[2] For reference, the parties divide the Site into three parcels, which they refer to as the west parcel, the central parcel, and the east parcel. Over the years, the central and east parcels housed gas stations, and a greasing pit or "lubritorium" was located on the central parcel. Underground storage tanks for gasoline have been found on the central and east parcels. From 1957 to 1967, Richfield Oil Corporation, the predecessor to Atlantic Richfield, leased the central and east parcels and operated a gas station there. Eventually, the northern half of the east parcel merged with 68 Main Street, which is now known as the Riviera Theatre. The southern half of the east parcel eventually merged with 51 Webster Street. Plaintiff currently owns 51 Webster Street and operates a medical office and parking lot there. The complaint alleges that during the time period Richfield Oil occupied the property, the tanks, pumps or piping leaked and discharged petroleum into the soil and ground water.

In 2011, the New York State Department of Environmental Conservation ("DEC") oversaw the remediation of ground contamination found at 68 Main Street. During that process, the DEC determined that contamination continued off of the property at 68 Main Street and onto the property at 51 Webster Street. Pursuant to the DEC's request, plaintiff conduced its own investigation of petroleum impacted soils and groundwater at 51 Webster Street. In 2017, plaintiff remediated contamination found in the southern portion

---

[2] The facts discussed herein have been taken from the amended complaint, pleadings, expert reports, motions and all other filings and representations made by the parties.

of the east parcel. Plaintiff alleges that Richfield Oil caused the contamination during their prior lease of the property and, as a result, defendant is liable for the remediation costs plaintiff has and will continue to incur there. The causes of action asserted in the complaint include violations of the New York State Navigation Law and common law claims of intentional continued trespass, public nuisance, private nuisance, indemnification, contribution and declaratory relief.

## *DISCUSSION*

### *Rules Governing Excerpt Testimony*

The Federal Rules of Evidence permit opinion testimony by experts when the expert is "qualified as an expert by knowledge, skill, experience, training, or education," and "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue." *See* Fed. R. Evid. 702. To that end, expert testimony is admissible where: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. *Id*.; *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (SDNY 2013).

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (SDNY 2009). Otherwise, if an expert's testimony falls within "the range where experts

4

might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the trier of fact. *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). The trial court's role is to "act as a gatekeeper with respect to expert testimony, properly admitting only such testimony as would help the jury understand the evidence or determine a fact at issue." *Hickey v. City of N.Y.*, 173 F. App'x 893, 894 (2d Cir. 2006); *citing Daubert*, 509 U.S. at 592-93. However, when the judge acts as the trier of fact, the court "has greater flexibility in satisfying its gatekeeping function vis a vis expert testimony…given the absence of the need to protect juries from dubious expert evidence." *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 639 (SDNY 2012). To that end, courts have found that resolving *Daubert* questions at a pretrial stage is "generally less efficient than hearing the evidence [since] if the objections are well-taken, the testimony will be disregarded in any event." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *6 n. 3 (SDNY Apr. 8, 2009). *See also In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.").

*Plaintiff's Motion to Exclude the Testimony of Dr. Gregory Douglas*

Dr. Gregory Douglas has a Ph.D. in Chemical Oceanography from the University of Rhode Island. (Dkt. No. 35-4. Pg. 23). His field of expertise is environmental forensic

5

chemistry and the "development and application of advanced analytical chemistry methods for the study of fate and effects of petroleum hydrocarbons and coal tar in marine sediments, soil, waste, waste water, petroleum products and biodata." (*Id.*). Douglas' *curriculum vitae* states that he participated in a number of oil spill studies for the Government and private industry. (*Id.*). In addition, he has published and presented extensively on how to identify and reliably monitor the degradation of petroleum products and crude oil in sediment and soil. (*Id.*). Douglas has testified in United States and international courts as to petroleum related environmental chemistry issues. (*Id.*). Here, Douglas conducted a chemical and forensic analysis of samples of water and soil sediments from the Site. He also analyzed sludge and sediments found in underground tanks removed from the Site. (*Id.* at pg. 2). His objective was to ascertain the type of petroleum products found at the Site and, to the extent possible, determine the age of the underlying petroleum products and dates of release. (*Id.*). It is anticipated that Douglas will offer the following opinions based upon this testing and his expertise: (1) petroleum products in waste oil Tank #5 indicate a simple, pre-alkylate era gasoline; (2) gasoline residuals associated with Tank #1 and Tank #2 sludge/sediment samples are a simple, pre-alkylate era gasoline; (3) the forensic chemistry results indicate that product releases likely occurred during the tank removal process; and (4) based upon site history, forensic chemistry and underground storage tank history, the gasoline residuals identified at the Site were more likely than not manufactured before Richfield Oil leased the site in 1957. In sum, Douglas opines that the residuals found and tested contain simple, non-alkylate gasoline. He will further opine that by 1957 the majority of the gasoline used in the United States was complex, alkylate gasoline. Therefore, he concludes that it is unlikely that

Richfield Oil, which controlled the property between 1957 and 1967, produced the gasoline that caused the contamination.

Plaintiff argues that Douglas is not qualified to render an opinion that the gasoline residuals identified at the Site were more likely than not manufactured before Richfield Oil leased the Site because that opinion is based on a non-expert understanding of the historical distribution of gasoline. Specifically, plaintiff argues that Douglas is not an expert on the economics of the petroleum industry or the marketing of petroleum products in the United States. The Court rejects this argument. According to the expert report, Douglas is not anticipated to opine about the sale and marketing trends of gasoline in the United States from the 1950's until the present. Instead, he is anticipated to offer an opinion as to when the contamination occurred based upon his analysis of Site samples, his knowledge of the chemical composition and refining of gasoline, and his understanding as to the historical use of additives, specifically alkylates, in gasoline. Douglas is qualified to offer this opinion testimony. As permitted by Rule 702 and relevant case law, his expert report references studies of refinery production and sales documents that describe when gasoline containing alkylates was sold in the United States. *See Gussack Realty Co v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) ("An expert may rely on data that she did not personally collect."); *Northbrook NY, LLC v. Lewis & Clinch, Inc.*, 09-CV-0792, 2012 U.S. Dist. LEXIS 134699 (NDNY Sept. 20, 2012) ("[E]xtrapolation is an acceptable method that…experts…use in making their conclusion."). Moreover, any dispute as to Douglas' credentials and his ability to render an opinion as to the time period of the contamination based upon the presence of alkylates in the samples may be fully explored during cross-examination and will be considered by the Court in determining

what weight, if any, to give Douglas' testimony. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (Disputes as to an expert's credentials, faults in the expert's use of scientific methods and procedures, and lack of supporting textual authority for the expressed expert opinion go not to the opinion's admissibility, but to its weight.).

Plaintiff also argues that the findings are not reliable because Douglas: (1) did not include samples from the northern portion of the east parcel; (2) did not include samples from all available underground storage tanks; and (3) did not take into consideration an Energy Information Administration report indicating that numerous refineries sold pre-alkylate gas during the time period of the Richfield Oil lease. Plaintiff's criticisms are matters for cross-examination rather than reasons to disqualify or strike Douglas' anticipated testimony. In *Dolomite Products Co. Inc. v. Amerada Hess Corp.*, the Court permitted an expert to testify that a sewer bedding or backfill located on a property facilitated the flow of containments, despite plaintiff's objections that the expert did not take groundwater and soil samples from either site, failed to consider certain data and provided no topographical information. 01-CV-6530, 2004 WL 1125154 (WDNY May 19, 2004). The Court found that those criticisms were "better addressed on cross-examination rather than by [plaintiff's] motion to exclude such testimony." *Id.* Further, it makes little sense to exclude this testimony prior to the bench trial. At trial, the Court, as the trier of fact, may consider all of Douglas' opinions and analysis in light of the arguments made on cross-examination and any contrary evidence or testimony offered by plaintiff. There is no danger here that the jury will be prejudiced by inaccurate scientific testimony or unsound methods. *See New York v. Solvent Chem. Co.*, 83-CV-1401, 2006 U.S. Dist. LEXIS 65595 (WDNY Sept. 12, 2006) (internal citations and quotations omitted)

(noting that the "primary purpose of the holdings in *Daubert* and *Kumho Tire* is to protect juries from technical evidence of dubious merit [and] this is not a prevailing concern where, as in this case, the court functions as the trier of fact.") .

Finally, plaintiff argues Douglas should not be permitted to testify that the gasoline sold during the Richfield Oil lease did not cause the contamination at 51 Webster Street because that is the ultimate legal issue to be determined by the trier of fact. "This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). Accordingly, courts exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." *Roundout Valley Ctr. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (NDNY 2004). The dispute need not be resolved at this time. Douglas may testify about, *inter alia*, (1) the chemical make-up of gasoline in general and of the samples he tested, (2) the use of alkylates and other additives in gasoline over time, and (3) his opinion, based upon his knowledge and testing, that the gasoline he found and studied was not likely to have been sold during the time period of the Richfield Oil lease. It is the Court's role to determine the ultimate legal issues presented in this case, including defendant's liability under the Navigation Law. To that extent that Douglas, or any other witness, seeks to offer a legal conclusion, that testimony will either be excluded at the time of trial or ignored by the Court in rendering its ultimate determination. There is no risk of jury prejudice here necessitating the Court to strike or exclude testimony prior to trial.

*Plaintiff's Motion to Exclude the Testimony of Michael J. Teeling*

Michael Teeling is a principal geologist with twenty-seven years of experience in the investigation and remediation of petroleum and non-petroleum sites. (Dkt. No. 35-5, pg. 6). He has a B.A. degree in Geology from the State University of New York at Buffalo and an M.S. degree in Geology from the University of Kansas. (*Id.*). He has "executed industry standard protocols for the removal of underground storage tanks both for worker and public health and safety and for the protection of the environment." (*Id.*). Teeling has also managed and executed site investigations and evaluations for petroleum refineries, terminals, pipelines and gasoline service stations. (*Id.*). It is anticipated that Teeling will offer the following opinions based upon his investigation and his expertise: (1) Richfield Oil's lease interest is limited to 1957 through 1967 and confined to the central and east parcels; (2) the available records do not confirm that Richfield Oil installed or owned underground storage tanks at the central and east parcels at any point in time; (3) there is no evidence of petroleum discharges during the time period that Richfield Oil leased the central and east parcels; (4) plaintiff's failure to conduct due diligence prior to its 2017 remedial activities resulted in the rupture of the water lines and adverse impact on the Site; (5) plaintiff's actions and omissions during the remedial activities in 2017 resulted in petroleum discharges; and (6) gasoline residuals and samples from Tanks 1, 2 and 5 are derived from a simple, pre-alkylate era gasoline manufactured before the Richfield Oil lease term. (*Id.* at pg. 7). Teeling's opinions are based on his review of: (1) legal and discovery documents; (2) environmental reports and data; (3) publicly available information including real estate documents; and (4) information about the geological and

hydrogeological setting at the Site. (*Id.* at pg. 8). His opinions are also based on his physical inspection and sampling of the Site. (*Id.*).

Plaintiff argues that Teeling's testimony should be excluded because he did not consider the entire parcel, failed to consider the direction of the groundwater flow, and failed to consider the effects of the prior remediation. Based upon the same case law and reasoning discussed above with respect to Douglas' testimony, these arguments go to the weight of the testimony rather than its admissibility. The Court, as the trier of fact, may consider all of this testimony "while guided by the *Daubert/Kumho Tire* standards of relevance and reliability and aided by the parties' '[v]igorous cross-examination [and the] presentation of contrary evidence." *Solvent Chem. Co.*, 2006 U.S. Dist. LEXIS 65595, *3; *quoting Daubert*, 509 U.S. at 596. *See also Joseph S. v. Hogan*, 06 Civ. 1042, 2011 U.S. Dist. LEXIS 76762 (EDNY July 15, 2011) (Indeed, without the risk of poisoning the jury with misleading expert testimony of limited probative value…the Court can take in evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology.").

Plaintiff further argues that Teeling should not be able to offer testimony that the composition of the gasoline found at the underground tanks is simple, pre-alkylate gasoline that was manufactured before the Richfield Oil lease because that opinion is essentially a repetition of Douglas' opinion. The Court has reviewed the expert reports and it does not appear that Teeling intends to merely restate the conclusions offered by Douglas. Teeling studied the Site history, the removal of the underground storage tanks, and the remediation process. He will opine that: (1) there is a lack of evidence that Richfield Oil installed, owned or was otherwise responsible for the underground storage

tanks removed during the 2017 remediation and; (2) that this opinion is consistent with Douglas' forensic findings as to the composition of the gasoline. *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 11-CV-6201, 2015 WL 629316, *2 (SDNY Feb. 13, 2015) ("The explicit reliance on the analysis of another testifying expert is entirely proper.") There is no reason, at this time, to exclude Teeling's opinion on the basis that it is repetitive of Douglas.

Finally, plaintiff argues that Teeling's anticipated testimony that the 2017 remediation was inconsistent with industry standards and caused a release of contamination should be excluded because it is irrelevant and unduly prejudicial. Plaintiff also argues that the photographs taken by Teeling are prejudicial because they appear to show that large amounts of containments were left in the tanks, when the tanks are actually filled with water. Testimony or evidence that the 2017 remediation process caused contamination is likely relevant to the issues of contributory negligence and the allocation of damages. Further, the Court's determination as to the relevance of this and other evidence is best made at the time of the bench trial, in light of the specific reasons for which the evidence is offered and the other evidence presented. *See Commerce Funding Corp. v. Comprehensive Habilitation Servs.*, 01 Civ. 3796, 2004 U.S. Dist. LEXIS 17791, *18-19 ("While the Rules of Evidence apply with equal force in jury and non-jury trials, courts often apply the relevance standard with little rigor during a bench trial [and] all doubts at a bench trial should be resolved in favor of admissibility."). Likewise, the Court is not concerned as to the potential prejudicial nature of this evidence or testimony. Rule 403 of the Federal Rules of Evidence states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by [*inter alia*] unfair prejudice."

*See* Fed. R. Evid. 403. In the context of a bench trial, there is no danger that photographs or testimony about errors made during the remediation will prejudice a jury. The Court, as the trier of fact, will objectively consider this evidence in light of the points made on cross-examination and all of the other evidence presented. *See BIC Corp. v. Far Eastern Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001) ("admission of evidence in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or her own decision analysis.").

### *Defendant's Motion to Exclude the Testimony of Jason Brydges*

Jason Brydges has a B.S. degree and an M.S. degree in Environmental Engineering. (Dkt. No. 40, Exh. L). He has experience determining sources of contamination and conducting environmental remediation, specifically with respect to underground storage tanks, dating back to 1995. (*Id.*). Brydges owns a company that specializes in environmental site remediation. (*Id.*). In preparing his expert report, Brudges inspected the Site himself and reviewed substantial documents related to the Site and the remediations. (*Id.*).

In his report, Brydges identified ten underground storage tanks that were installed in the central and east parcels of the Site over the years. (Dkt. No. 35-14, pg. 5). He explains that most of the recently remediated contamination was found on portions of the Site that were leased to Richfield Oil from 1957 through 1967. (*Id.* at pg. 6). Brydges also opines that the Site was remediated in two separate phases and that the remediation included a significant portion of the total area owned by Richfield Oil. He explains that, as a result of groundwater flow, the remediation can only be fully understood by considering both the southern and northern portion of the east parcel. (*Id.* at 7-11, Dkt.

No. 40-1). He will offer an opinion that, based on the historic records, including land title records, as well as the location and type of tanks and remediated contamination, the contamination can be attributed to the operations controlled by Richfield Oil or its predecessors. (Dkt. No. 53-14, pg. 11). He is also anticipated to offer an opinion, contrary to Teeling, that the 2017 remediation was appropriate as requested under New York state law and conducted in accordance with the rules, regulations and directions of the DEC. (*Id.*, Dkt. No. 40-1).

Defendant argues that Brydges testimony should be precluded because it will not assist the trier of fact, is not based on sufficient facts or data, and is not the product of reliable principles and methods. Specifically, defendant argues that Brydges did not conduct any type of forensic age-dating analysis of the contamination where the petroleum release occurred and that his analysis of the remediation lacks regulatory or factual support. Defendant also points to Brydges' deposition testimony that he does not know specifically which, if any, tanks were installed, owned or operated by Richfield Oil during the lease term. Defendant's criticism of the anticipated testimony goes to its weight and not its admissibility. Indeed, defendant may explore problems in Brydges' scientific methods, the lack of factual basis for his conclusions or other faults in his analysis during cross-examination. For the same legal principals and reasons discussed above with respect to the requests to strike or exclude the testimony of Douglas and Teeling, defendant's motion to strike or exclude Brydges' testimony is likewise denied.[3]

---

[3] Defendant also moved to strike the portion of plaintiff's counsel's declaration in support of the motion to exclude that included a picture of 68 Main Street on the basis that it incorrectly depicted the location of five underground storage tanks removed from the Site in 2014. It is anticipated that, at trial, each party will offer photographs and maps depicting the location of the underground storage tanks as well as the remediation process. The Court will consider all of the photographs, maps and other related evidence at that time. The map included in plaintiff's counsel's declaration has not been relied on by the Court in determining the instant motions and there is no basis to strike it.

## **CONCLUSION**

For the foregoing reasons, both plaintiff's and defendant's cross-motions to strike and exclude expert testimony are denied. (Dkt. Nos. 35, 38). Counsel shall appear before the Court on January 11, 2019 at 12:00 p.m. for a meeting to set a trial date.

**SO ORDERED.**

Dated:   December 27, 2018
         Buffalo, New York

                                              */s/ Michael J. Roemer*
                                              MICHAEL J. ROEMER
                                              United States Magistrate Judge